Your honors, good morning. May it please the court. My name is David Given, and I am representing the appellant in this case, Signatures Network, Inc. This matter comes before the court on the grant of a summary judgment motion by the district judge. The question involves a matter of contract interpretation. The license in issue is a merchandising license agreement between the parties. The standard of review in this case is de novo. The two legal issues in this case really boil down to this. One, what I call the textual analysis, which is in looking at the actual language of the party's contract, which is where any contractual interpretation case begins, what does it say, and what did the parties mean by the language they used. The second issue is what I'm calling the circumstance or consequence analysis, which really is the competing views of the two parties as to the practical sense that one can make from the language that the parties used in their agreement. I'd like to start by just creating some framework for the court in describing how the parties' merchandising licensing agreement worked. The key provisions in that contract are as follows. First, there's a grant of rights that runs from the Estefan parties, the appellees here, to the merchandiser, the appellant, Signatures Network. There's compensation that's paid. In this case, it was a large advance, in excess of a million dollars. Roberts. Counsel, you're a little general for me. Gannon. Yes, sir. As I understand it, under the first agreement, everything was done. It had been disappointing in terms of the financial returns, but Estefan had performed her duties. No further repayment was due. And then under the amendment, there was an advance of $175,000. She didn't perform her obligation to have the concerts. She paid back or tendered the $175,000 after some dickering. So the $175,000 is all over. What we're talking about is recouping the advances from the first agreement or repaying the advances from the first agreement because of the amendment. Have I got that right so far? That sounds right so far. Yes, Your Honor. Now, on the amendment, the repayment language at 7, looks like 7 and then the indented part looks like a 6.4 on my Xerox. Yes. It says, Signatures has the right to require a licensor to repay all unrecouped advances paid hereunder. Yes, sir. My reading of that is that it's plain she had to give them back the $175,000. That was an advance paid under this amendment. And it says she has to repay it if it wasn't recouped out of concert proceeds. As for the advances under the first agreement, it looks to me like she beats that because of the word hereunder. Those were unrecouped advances, okay, but they weren't paid hereunder. They were paid under the first agreement. Well, what am I missing here? I mean, you lose if that reading is right. Judge, you hit the nail with your head because that's the exact language I would have started with in analyzing it from the text of the parties' agreement. What you're missing here is the following. The use of the word all, the use of the word, the defined term all. Okay. But I also see the hereunder, so you need to talk about the hereunder.  Well, hereunder is the crux of the other side's argument. Now, our argument is that when the parties delete and replace a provision of the existing agreement, hereunder has to be read in the context of the agreement, not in the context of the party's amendment. Now, they've offered one ---- Kennedy, why would anybody enter into an agreement where the word hereunder includes a first agreement that has been ---- is finished and over and done with? I don't understand why anyone would enter into the economic motive of anybody entering into an agreement where the word hereunder now includes something that has been concluded some time ago. Well, the party ---- Judge Merritt, the party's agreement was not over with at the end of the 1997 tour, and it's conceded on this record. Yes, the fine ---- Well, the agreement part of it was, wasn't it? Well, I don't accept that, and I've laid out the arguments in our brief as to why I think ---- Yeah, but I mean, it doesn't ---- your argument doesn't make economic sense to me as from what I understand the facts to be. Why would the Escobar group enter into any such agreement as that and open themselves to the possibility of having to repay not only the $175,000, but $300-and-something thousand, which had been concluded from the first agreement? There's a simple answer to that. That's the quid pro quo for the additional advance. I mean, keep in mind, Your Honor, that at the time of the contemplated tour in 2000, Signatures had the right to continue to recoup the original advances that had been paid under the original agreement. So when the parties set up this amendment, Signatures already had the right to service the tour in the year 2000. So the economics of it is the Estefan parties come to Signatures and say, we want some more money. And Signatures says, that's fine. We'll give you some more money, but you've got to go out and tour, because that's the only way we're going to make our money back in this, and that's the only way we're going to make a profit in this. So they agree that if she does go out on tour, she'll receive an additional $325,000. If she doesn't go out on tour, if there is a gap in her touring, then she is contractually obligated, upon Signature's request, to repay the entire, or as the words that are used, are all unrecouped advances paid hereunder. Now, every indication in this contract, Your Honor, is that advances are treated cumulatively. And by use of the defined term, advances, first, it's plural. It's not singular. And second, it has a definition in paragraph 14.2, and I'll read it to the Court. Advances shall mean collectively the advance and any other amounts deemed additional advances pursuant to this agreement. So that's a defined term that's used in the amendment, and there's a clause in the amendment that says all the defined terms that are used herein shall have the meaning of the original agreement. And, you know, I want to take exception to something that Judge Kleinfeld said. Judge, you started by sort of characterizing two separate agreements. There are not two separate agreements here. I don't know about that. There's one agreement. When I look at the amendment, paragraph 5 uses the phrase, upon recoupment of all advances under the agreement and this amendment. And to me, that reads like a distinction between the original agreement and the subsequent amendment. It looks as though the parties really contemplated that there are two deals. Well, the response to that is, right, this is a stand-alone provision, Your Honor. This is a provision that subsists in the amendment but does not subsist in the original agreement. Keep in mind that the paragraphs that we're looking at, paragraph 7 of the amendment, offers two entirely new paragraphs, paragraph 6.3 and paragraph 6.4, which are deleted in their entirety and replaced with the following. And that's my argument on hereunder. When the parties used the word hereunder, they meant it in the context of the original agreement. And signatures paid those additional advances with the understanding that if the Estefan parties did not conduct the tour as promised, which they did not do, that would be payment of all unrecouped advances. Again, defined term. Let me see if I've got the logic of this right. Yes, sir. The reason hereunder doesn't mean the amendment. It means the original agreement. It's that the introductory language in 7 is says, replace some language in the original agreement with this language. That's correct. Sure. So the hereunder would drop into the original agreement. That's exactly right. Okay. And if you compare the original paragraph 6.3, Your Honor, and 6.4 with the amended paragraphs 6.3 and 6.4, they're virtually identical. They're identical, except for, except for the start date, which explains this prospective retrospective argument that's being made. The language that says from and after the date of this amendment. The clock restarted. The clock restarted. There's a 90-day provision under paragraph 6.3, and there's a 180-day provision under paragraph 6.4 that relates to gaps in what are called qualifying performances. Yes, sir. Let's say there's an ambiguity there. Yes, sir. Then, and this is a diversity case, right? It's always the worst case if the parties have written a contract and there's an ambiguity. Yes, sir. But, I mean, how to handle the ambiguity as a matter of allocation of authority to judge and jury, so to speak. Yes. How do we come out on the rest of the argument about ambiguity? Yes. I'm not sure this Court has to reach that question. I believe that effectively what you have is an argument over the word hereunder. Judge Kleinfeld, you hit the nail with your head on it. Ambiguity in the district court is interpreted, the ambiguity to mean what he thought it meant in the court below. So you had an interpretation of the contract. Why isn't that why don't we look at that question? Well, Your Honor, in the normal course, if there's an ambiguity in the contract and both sides have presented an interpretation of the contract to which it's reasonably susceptible, which it sounds like that's the direction that you're going on at, Judge Merritt, that the summary judgment is inappropriate under those circumstances. The district court is so found, and there's plenty of case law in the Ninth Circuit to that effect. Now, you get deeper into it when you start looking at the conflicting inferences that can arise in connection with those reasonable interpretations, and whether it goes to a judge or whether it goes to a jury, that can be sorted out by the district court. But the mistake in this case was, one, to assume that there was no ambiguity, and then, two, to exclude our extrinsic evidence both on the subject of the ambiguity and on the subject of what the contract meant, assuming there was an ambiguity. The declaration that you submitted in support of a — I forget what that fellow's name was, but — Michael Gunsberg. The district — he wasn't even — he didn't participate in the original negotiations of the document, of the contract. That's true, Your Honor. That was worthless. I don't agree, Your Honor. It was worthless. It wouldn't have been admitted. It was worthless. It had no value. It had value in this case. Let me ask you this. Turning to the amendment, paragraph 7, you know that new paragraph 6.4 makes reference to artist major U.S. tour. The new one in the amendment, which is, if any reason, artist major U.S. tour does not begin by September 15th, 2000. Right. So wasn't this all referring to the new tours in the United States? Wasn't the first one an international tour? The first one was an international tour. The second one was a — primarily was intended to be a U.S. tour, yes. That's what it says, major U.S. tour. Yes. And those conditions were not met. So the payment, the advance, was for the U.S. tour? The advances are treated cumulatively, Your Honor. Every other — as I've said before, every other indication in this agreement, the definition of advances that's given at 14-2, the treatment of advances in the royalty reports that were in the record, is that advances are treated cumulatively. And I've tried to explain to Judge Merritt what the economic sense of this agreement was, what the practical sense was. Signatures is hamstrung. It has no control over whether Gloria Estefan tours or doesn't tour. The point is, if they're going to pay additional money, they want to make sure she gets out on tour and that they recoup their entire advance. And if she fails to do that, they want to assure that they will be repaid their entire advance. Counsel, if you are right that there's an ambiguity, let's say, hypothetically, you say you are automatically then entitled to a reversal of the summary judgment, right? Yes. When you get back down to the district court, what is your position about who decides the ambiguity? Well, that's going to depend upon what the discovery in the case is, how the case proceeds. As I've said, I think it will get sorted out by the judge in the district court, Your Honor. You know, the issues of evidence and who decides what on issues pertaining to contract interpretation boil down to what the conflicts in the … The district judge looks like to me has already given you his best guess as to what the meaning of this is. She has. She has, okay. So you're going to want a jury trial on the question of the meaning if there is an ambiguity. Is that right? We're going to ask that there be a trial on the merits on the facts. Now, whether it's a judge trial or a jury trial, I think that remains to be seen. Help me with something that's raised by Judge Merrick's questions. Yes. California parole evidence rule is a little strange to me because I'm an Alaska lawyer. We have the common law parole evidence rule. Right. As I understand it in California, instead of never considering extrinsic evidence, you always consider extrinsic evidence. That's correct. Now, since it's summary judgment, the judge converted her 12B6 to summary judgment, that means whatever evidence would create a genuine issue of material fact that was incumbent on the parties to put it before the judge, if there wasn't time and discovery because this started off as a 12B6 motion, then it was incumbent, I suppose, on a party to ask for 56F continuance once she converted it from a 12B6 to a 56. And I don't think that was done. It was not done. So I look at the evidence. Let's say it's ambiguous. Okay. What is the evidence submitted? And the only thing I see is a lawyer's demand and settlement talk, which to me adds up to nothing. Well, it's not even admissible. Well, I think it's more than I think the Gunsberger Declaration reflects more than that, Your Honor, with due respect. Michael Gunsberger is the manager of Business Affairs at Signatures. I don't think a trier of fact can read settlement talk. Not everything in his declaration is about settlement. A lot of it is about what he does at Signatures, the business that Signatures is in, the manner in which Signatures enters into these contracts. You say he negotiated either the amendment or the original agreement. He has no precipient knowledge. No, but he does. But his testimony --- Like Judge Kleinfeld said, that affidavit is worthless. No, that's -- well, I thought you said that. But in any event, I disagree respectfully in this regard, Your Honor. That's fine. You can disagree. You know, Judge Kleinfeld hit it right on the head, though. But let me just finish. Michael Gunsberger's declaration, at the very least, reflects custom and practice in the industry. And that is relevant to intent. It's always relevant to intent. Okay. In addition, it's reflective of the party's course of action. Oh, I see. You're saying disregard the parts that are about this deal, okay, but treat him as somebody with knowledge of the deal. Knowledge of how these deals work. That's exactly right, Judge Kleinfeld. And I think I'm entitled to that inference, Your Honor. I am the nonmoving party. Okay. Tell me the page to look at for the declaration. Okay. You want to look at the record. I looked at the letter, and I thought, geez, it's settlement talk. I don't care what it says. So I didn't pay much attention. Well, it's interesting you should say that, Your Honor, because Exhibit B, which is at Record 148, which is the notice letter that was sent by Michael Gunsberger, that's not a settlement communication. Well, wait a minute. That's not a declaration either. Rule 56C says I'm supposed to read declarations, affidavits, deposition excerpts. Right. But let me just finish. The district court excluded the entirety of the Gunsberger declaration. Just threw it out and said it was all settlement stuff. It goes out under Rule 408. It was invited to do that by the Estefan. Is there a separate declaration that I should be looking at other than this letter? Well, this one. Yes. Yes. Yes. The letter is attached as Exhibit B to the Michael Gunsberger declaration, which starts at Record 111. So if you just take a moment to look at 111. Paragraph 1, he identifies himself as the manager of Business Affairs of Signature Network. Paragraph 3, identifies himself as the custodian of records. Paragraph 2, he identifies signatures and the business in which it's in. The principal business of signature is reading from Record Site 111. So where does he opine that he is, you know, knowledge and skilled and what the industry practices are and customs and practices are? This is all about disagreement and the settlement negotiations that Judge Kleinfeld keeps talking about. What paragraph in this declaration, which paragraph or paragraphs, shows custom practice? I think there's a paragraph where he talks about. No, no, show it to me. Which one? Number. Number and line. Okay. So number 112 at the top. Number 1. No, no. Paragraph 2. Paragraph 2. What does that have to do with custom and practice in the entertainment industry? He uses the word typically. Okay. Let's go with you on that. The custom you need here for this case, I think, is when your first concert tour is disappointing, you don't get another advance unless you promise to repay and not just allow recoupment of your previous advances. I think that's the custom and practice you're looking for. And it would impress me if that was the custom and practice of the industry, but I don't see the evidence in the declaration. Well, I would say this. There is — it seems to me, and I know Judge Paez, you disagree with this strongly, that there's enough in this declaration to at least draw an inference from that the party's intention was consistent with Signature's actions when it sent the notice letter. You show me the — you understand what I'm looking for? I do, yes. I mean, there is not a specific — I can imagine a business either way, and you point me to page and line or paragraph of this declaration that says the custom in our industry is you don't get a second advance if we didn't recoup the first unless you agree to repay the first. Right. I'm sympathetic. Just show me. Yes. Okay. Well, there's nothing that explicit in the declaration. I would concede that. But what I — my argument is simple, and that is that there's enough in this Michael Gunsberger declaration taken together with the two citations that I gave to the learned expectations in this business are that when you're going to terminate a merchandising license agreement, you're going to repay the entire unrecouped advances. And that's exactly the language that the parties used here. I'd like to reserve a couple — well, I've got five minutes. You're actually three and a half minutes over. You went over time. Well, I thought I reserved five minutes. Okay. So I have a minute and a half left? Oh, I see. You've spoken for 23 and a half minutes. Okay. Got you. I thought it started at 15. That's why I was — Did it? No, sir. Thank you. Okay. Thank you, Your Honors. Good morning. May it please the Court. My name is Jeffrey Knowles. I'm appearing for defendants and appellees Gloria Estefan and Estefan Enterprises. We agree, of course, that the core issue in this case is one of contract interpretation. I think it would be helpful to start that process by understanding the structure of this relationship and that it involves a significant allocation of business risk. While signatures obtained licenses to use Ms. Estefan's intellectual property to sell to pay her approximately one-third of the income generated from those sales, it also agreed that it would advance money against that contemplated income of approximately a million dollars. When it did that, it took the risk that it would never actually recoup that money from those sales. I guess they do that because they get a lot of money on the artist regardless of the recoupment. They're taking roughly two-thirds of the income anyway, so — They don't need the T-shirt recoupment. They may not. It's a calculation they make. So they get two-thirds of the income regardless, and then they get 100 percent of the income until one-third of it accumulates. They could actually make money if they didn't recoup a nickel from the T-shirt royalties and the CD royalties and all that kind of thing. Exactly. So when they advance the money, they take the risk that they'll never actually recoup it from the Estefan's share of the royalties. Now, to mitigate that risk, they do negotiate for some circumstances in which they can ask the Estefans to dig into their own pocket and pay the money back, for example, if they cancel the tour. In return, the Estefans mitigate that risk by saying, well, but if we perform — if we do our tour and we perform before the requisite number of people, in this case, in the world tour, 600,000, then we're no longer at risk to pay that money back. We don't have to come into our own pocket. You look only to the income stream. How does it work now? They get two-thirds of the proceeds? Signatures receives roughly 63 percent of the proceeds and the — Proceeds from what? Sale of merchandise. Ticket sales? No. It's from the sale of the merchandise. And then the Estefans receive roughly one-third or a little more than a third of that. But, again, that goes first to the advances. Now, paragraph 511B of the original agreement made very clear, couldn't have been clearer, that if the Estefan parties hit their performance requirement, 600,000, and the words are — and they've complied with — otherwise complied with the agreement, the words are, they need not repay any unrecouped advances, period. End of story. They hit that 600,000-person benchmark. Any risk of having to repay out of their own pocket was gone at that point. And all the way up through the process below, up to the end of the oral argument before the district judge, everyone seemed to be in agreement on that. So the issue was, was that right to demand repayment somehow resurrected in something that happened in this amendment several years later? Could you speak to the argument your adversary makes that Section 6.4, which limits the repayment obligation to unrecouped advances paid hereunder, applies not just to the 175,000, but to the unrecouped advances from the first agreement? And the reason why is that, if you look at the numbering here, this language isn't just part of the amendment. It's substituted for language in the original agreement. So the hereunder is part of the original agreement and refers to it. If that's what I understand the argument to be, go ahead and tell me why you think that should be rejected. Yes, Your Honor, I'm happy to. This actually dovetails exactly with what I was just saying. It is this provision that Signatures is pointing to as resurrecting an extinguished right to demand repayment. Now, there is nothing in here, of course, that literally says we are resurrecting that extinguished right to demand repayment. It doesn't say that anywhere. So they're relying on this language that says if Ms. Estefan doesn't commence her new U.S. tour, then advances paid hereunder refers not to the ones we've just given you, but to the ones we gave you before and that you no longer had to repay. And there are essentially three compelling reasons why that has got to be wrong, why it can't possibly be the right interpretation of this agreement. First, the preamble language of Paragraph 7, the very first words, say, from and after the date of this amendment, making crystal clear that these changes that are about to be made are prospective only. Not only does this not resurrect an extinguished right, it's expressly prospective only. Secondly, as I think you pointed out, Judge Kleinfeld, the phrase paid hereunder or advances or royalties, the phrase hereunder, the word hereunder is used elsewhere in this amendment to expressly distinguish without question between the amendment and the agreement. And that is the last sentence of Paragraph 2 of the amendment, and that reads, for purposes of clarification, the unrecouped advances paid under the agreement shall continue to be recoupable from royalties earned hereunder. In that context, they're expressly distinguishing between advances paid under the agreement and royalties earned hereunder, meaning the amendment. So the only other time this agreement uses hereunder, it's expressly clear that it refers to the amendment, not to the agreement. And finally, I respectfully disagree with my opposing counsel that advances is not redefined in the agreement or in the amendment. Excuse me, the amendment. It is. Paragraph 2 of the amendment starts with the heading advances and then lists the new advances that are to be provided. Now, if you look at the way the original agreement described definitions, you will see in Paragraph 14 that the term advance is the first term listed. It's on page 13 of the amendment agreement. And it says advance is defined in Paragraph 5.1. The format of that definition is exactly identical to the format of the definition in the amendment. You have advances and then a listing of the advances that are to be paid in connection with the anticipated tour. Finally, the ---- Kennedy. Hold on. I'm trying to follow what you just said. Let's see. You're saying the definition of advances in 14.2 of the first agreement is replaced by the definition of advances in Paragraph 2 of the second agreement. That's right. But Paragraph 2 doesn't purport to be a definition section. It just says how much money is supposed to be advanced and when. My point, Your Honor, is that this fashion of defining terms, that is, by beginning a paragraph with a heading, with a word, is recognized in the agreement as the process by which you would define the term. That would be a good argument if the language was parallel, but it isn't. In the original agreement, the definition section, it really reads like a definition. It doesn't say how much and when paid. It says advances shall mean collectively the advance in any other amounts deemed additional advances pursuant to this agreement. I see where you're looking, Your Honor. I think we're looking at different provisions. I'm looking at Paragraph 14.1, not Paragraph 14.2. Oh. And Paragraph 14.1 lists the terms that are defined elsewhere in the agreement. The very first one on that list is advance, and it says that that term is defined in Paragraph 5.1. If you turn to Paragraph 5.1, you will see that the format of that definition is a paragraph with a heading that says advances. Counsel, do you have an even-if argument, also, that even if there is some ambiguity about what the word hereunder means when it refers only to the hereunder as the amended agreement, the amendment, or inclusive of the original agreement, even so, you still win? The yes, Your Honor. The way that Signatures is asking that this agreement be interpreted would lead to obviously unintended and arguably absurd results. Signatures is saying that without ever actually saying so, this document, the amendment, resurrected an extinguished right that everyone, through most of this case, agreed had been extinguished. And the only way they can get around that is if there is some explicit language in here that is just missing. It isn't there. The hereunder language, and by the way, there's an additional reason why that, beyond definitions, why that wouldn't make sense. The amendment makes clear, capitalized terms used in this amendment without definition shall have the meaning ascribed to them in the amended agreement unless the context indicates otherwise. And when you compare the context of these two agreements, what was going on was in exchange for Ms. Estefan-Turing, she was going to receive advances against royalty income. That happened in both cases, separate advances, separate tours, separate sets of obligations. They are completely parallel in all of those respects. Wait. In terms of making sense, I have some trouble with that. I'm thinking Estefan comes to Signatures and says, I think I want to do another tour, and I want another $325,000. A logical answer from Signatures might be, no, I don't think so. First tour was a disappointment. We didn't recoup our advance from the sales. And she says, what can I do to make it worth your while? I really want to get $325,000 now. I don't want to have to wait until the nickels and dimes trickle in from CD sales. And they say, you've got to revive your obligation. First of all, you've got to let us recoup the old money as well as the new money that we advance you out of sales. And second, if you don't do this new tour, if you just get the money and then tell us bye-bye, you have to repay everything. To me, that makes some business sense. It could have played out that way, that Signatures came to Estefan and said, well, we're only going to give you these advances if you agree to resurrect your potential obligation to repay these old ones we didn't recoup. And if she really needed money, it makes sense that she'd go for it. It's very possible. Some people don't like waiting years for the trickle in of royalties. The problem is that there's no evidence in this record of any kind that that's the case, and let me point out something about your hypothetical scenario, Judge Kleinfeld. As we discussed, there is no indication that Signatures necessarily considered the original world tour, which was a success, to be a disappointment. They have not submitted evidence saying that they were hurt at all financially. I thought the evidence was they didn't recoup their advance. Yes, but that doesn't necessarily mean they lost money on that tour. But it still means they didn't recoup their advance. Of course. They didn't make as much as they thought they were going to make. They certainly hope to recoup those advances, no doubt. But that shortfall doesn't necessarily mean that the overall tour was a disappointment. And Signatures' incentive, which they've made clear here, is to get Ms. Estefan to tour as much as possible because that's the place where they're going to make the most money in the sale of merchandise. So in 2000, when they are negotiating for this new agreement, Signatures wants to create as much incentive as possible for Ms. Estefan to actually tour. Your even-if argument is that even if you can say abstractly that there is the possibility of ambiguity here, that when you look at the evidence, what the record shows, there is no evidence that the parties intended to go back to the first agreement to recoup. That's your basic answer. That's exactly right, Your Honor. If you look at the agreements as a whole, there is no evidence or indication of intent in the agreements. And there's no, by the way, relevant extrinsic evidence anywhere in the record. The conclusion you must draw is that the only reasonable interpretation is that there was no intent to resurrect that old obligation. And let me speak to a question, Judge Merritt, that you addressed to Mr. Given. It is not accurate to say that a determination that there's an ambiguity means the case goes back down to the district judge. Signatures never offered evidence to the district judge, never said, here's what we're going to put in or here's our evidence to resolve or raise this ambiguity. They offered the Gunsberger Declaration. It clearly has nothing to do with any of this. In fact, that declaration had been submitted months earlier in connection with a different motion. It wasn't even submitted for this motion. There was no evidence. They've not said we've got other evidence. They've not said we need to take evidence under 56F from the other side. There's no reason to think that there would be a trial of any kind at the lower level. So even if there is an ambiguity here, the cases are clear that what the court should do and what the trial court effectively did, even though she thought it wasn't ambiguous, is work through the various rules of interpretation and determine what the meaning was intended to be. And if you look at these agreements as a whole, it is simply not plausible to suggest that Ms. Estefan or her company intended to resurrect the obligation that had been extinguished. Why isn't it plausible? It isn't plausible for two reasons. To me it makes perfect sense. It's so easy for her to keep it extinguished. All she has to do is go on a tour. And they have every reason to want to make sure she really does go on a tour, as she promised. It seems like looking at it in advance, looking at it when they're negotiating the amendment, as opposed to looking at it from behind, she would gladly agree to revive her repayment obligation because she in good faith would plan to go on the tour. And that means all she'd have to do is show up, and she doesn't have to worry about repaying the money out of her pocket. And it seems like they, looking at it in advance, would very much want to put maximum pressure on her to go on the tour, because otherwise it makes no sense to advance another $325,000 when they didn't recoup all the money from the first time. The simplest answer to the question of why it's implausible is that there is no language supporting that conclusion, that you don't have to torture in order to arrive at that conclusion. And the broader answer is that for Ms. Estefan to have agreed to resurrect this old repayment obligation would have been exposing her to a lot more risk that she had already eliminated. No risk if she goes on her tour. Well, no, she would still have a risk. And the reason is that nobody shows up, I guess, if nobody buys tickets. Or if there's a postponement, or if she's injured. The provisions for right to repayment aren't just limited to her commencing the tour. She can insure against injury. Well, she could. The postponement would be up to her. But every tour you take is a risk that you won't draw sufficient people. And if she doesn't draw sufficient people, according to Signature's argument, she still has to repay the advances. So she would be taking on very significant risk, and there's no language in here to suggest that she actually agreed to do that. Well, what you're saying is that even if this case were to go back under a theory of ambiguity, the district judge would still just take into account whatever the extrinsic evidence is under California law, I guess. And the likelihood is, the strong likelihood is, that she's just come up with the same interpretation she's already given to it, right? Absolutely. There's no reason to think that it would be any different. There's no reason to think there would be any other evidence presented. I guess they could have affidavits about whether they talked to each other along the lines that I've speculated. But they had that opportunity, and they didn't put them in. We moved for summary adjudication, and the only evidence they put in was this Gunsberger Declaration, which wasn't even evidence in this motion. It was just an earlier filed declaration. So there's no reason to think that there would be any trial below. The 1995 ---- Well, I guess that could present evidence of custom and practice. Conceivably, although I agree with you that the Gunsberger Declaration is not that. But again, there was nothing to stop them from putting that evidence in when the motion came up the first time. So on this record, there's no reason to think they have any such evidence. Okay. Let me just close by saying that if you look at the allocation of risks by the 1995 and 2000 agreements, and then you look at the plain language of the two agreements, occasionally you have to work through some intricacies and complexities like the definitional sections and so on. But when you do walk through all of those, there is only one reasonable conclusion you can draw. And that is that the parties never agreed to resurrect a dead and gone right. The new advances were paid to create an incentive for Ms. Estefan to tour. She decided not to tour, and she paid that advance back. Signature's got the benefit of its bargain. The agreements worked exactly as they were supposed to. There's only one reasonable reading, and we ask that you affirm the district judge. Thank you, counsel. Thank you. You used up your time, but take 30 seconds or a minute anyway. 30 seconds. On the subject of additional affidavits, the Court – I'd invite the Court to look at the supplemental record that was submitted on a motion that was made by the Estefan party starting at SER 128, et sec. There is a series of letters between the parties contemporaneous with the execution of the amendment that talk about a buyout right and they talk about a buyout right in connection with repayment of all unrecouped advances. That's worth looking at. Were these in front of the district court? No, sir, it was not. But, again, it was the invitation of the other side to supplement the record in this court. So I'd invite the Court to take a quick look at those. On this – the only other thing I would say on this subject of Signature's making vast profits, you know, two-thirds of the income going back to Signature's, that's not the way this business works. And if this Court has any interest in how this business works, there's a slip-up opinion by Judge Henderson in a case called Winterland v. Mendler. It's a case that I tried. It was a copyright infringement case where Judge Henderson did an analysis of how the business of music merchandising works and what the true profit margin in this business is. Suffice it to say, it's a very, very tight margin. And that's why it's important that Signature's have that right of repayment in these contracts. Thank you, counsel. Signature's v. Estefan is submitted. United States v. Arachiga-Ramirez is submitted, and we are adjourned for the day.
judges: Merritt, Kleinfeld, Paez